# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JASMINA KOZOMARA,**

    Plaintiff,

  v.                                      Case No. 19-CV-955

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    Defendant.

---

# DECISION AND ORDER

---

Jasmina Kozomara seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's decision will be remanded for further proceedings.

## BACKGROUND

The plaintiff's disability claim is based on diagnoses of rheumatoid arthritis (RA), which was diagnosed when the plaintiff was seventeen years old, as well as hypothyroidism and Sjogren's syndrome. She alleged disability beginning June 24, 2015. After the Commissioner denied her claim initially and on reconsideration, the plaintiff appeared before an administrative law judge (ALJ) on October 13, 2017. (R. 14.[1]) The ALJ issued an unfavorable decision and the Appeals Council denied the plaintiff's request for review.

---

[1] The transcript is filed on the docket at ECF No. 13.

At the time of the hearing, the plaintiff was forty years old and had last held a job in June 2015. (R. 22). The plaintiff testified that she had most recently worked as a certified nursing assistant at an outpatient wound care center, which involved interacting with patients and getting them ready for their appointments with therapists. Most of the job required standing, as well as the need to assist with lifting and moving patients as large as 200 pounds. (R. 23-24). She stated that while she held that job, she was able to lift approximately ten pounds, although she had difficulty estimating weights because she was "bad with numbers." (R. 24).

Prior to her work in the wound care center, she had been a nursing assistant in a surgery setting, with responsibility for getting rooms ready for surgeries—moving trays, cleaning the operating rooms, and sterilizing instruments. (R. 24-25). Some of the trays she lifted were as heavy as fifty pounds. She testified that she left that position because it became too hard for her to manage. (R. 26). She was no longer able to stand on her feet all the time, and she lacked the strength to lift some of the instruments and push the surgery carts. Prior to that job, she worked in a respiratory unit and was responsible for bathing, feeding, changing beds, cleaning, checking vitals, and drawing blood. That position also required being on her feet all day, with the need to lift twenty to fifty pounds. She held that position between 2005 and 2012, and ultimately left because it was becoming too hard to cope with an increase in patients who needed everything done for them, including bathing and putting their clothes on. (R. 26-27). In addition, it was an early shift, and the plaintiff stated she needed to wake up two hours earlier (5:00 a.m). in order to "warm up" due to her rheumatoid arthritis. (R. 27). Before 2005, she worked as a hostess at an Olive Garden restaurant. Although that

position did not require much lifting, she testified that she left because her arthritis got worse and she could no longer stand the pain caused in her feet and knees due to standing. (R. 28).

Upon questioning by the ALJ, the plaintiff testified that she could no longer work because she was in pain "24/7," and the pain was "everywhere, especially my hands; my hands are the worst, my wrist and my knuckles." (R. 29). She explained that her wrists became fused as a result of prednisone treatment after being diagnosed with rheumatoid arthritis at age seventeen. (R. 29). In addition to the pain in her hands and wrists, she stated that she felt pain from her jaw to her shoulder, elbows, knees, hips, and lower back. (R. 30). At the time of the hearing she was taking Enbrel shots; in the past, she had used Enbrel but then it had stopped working after about a year. She conceded that the Enbrel was now working again, and "it's better than it was, like I can actually do some stuff. I can get up in the morning and once I start moving I can actually move." (R. 31). Upon further questioning, however, she stated that her condition had gotten "a little worse" since she stopped working two years earlier. (R. 32).

The plaintiff testified that she experienced a flare-up of her condition approximately once per month, with the most recent flare being two weeks earlier and apparently continuing to linger through the time of the hearing itself. (R. 32). She is able to mitigate the flare-ups by using prednisone, which her rheumatologist prescribed. "He gave me a big bottle of prednisone," she testified, so she didn't have to call him every time she had a flare-up. (R. 33). During a flare-up, she testified that "everything stops working, everything hurts. I cannot even touch my skin." (R. 34). She stated that she had not had such frequent flare-ups her whole life, but only in the last five years. She was able to work through them because she was put on light duty at work. (R. 36). In addition, she estimated that she had taken one to two

3

months of sick leave under the Family and Medical Leave Act leave during her last several years of working. (R. 37). When the ALJ appeared surprised that she could take that much leave and still keep her job, she replied, "You get 12 weeks per year." (R. 37).

The plaintiff testified that she was able to sit as long as she could move around in her chair to "shift my body and legs, my knees and my hips, my neck." (R. 39). Depending on the day, she could stand a few hours, or only five minutes. She stated that at the time of the hearing she wasn't sure she would be able to lift something as heavy as a water bottle. (R. 41). In response to the ALJ's questioning, she conceded that in April 2017 her rheumatologist found that her RA was much improved with a combination of Enbrel and a low dose of methotrexate, which were well tolerated. (R. 43). She was also able to drive a car and had no trouble gripping the wheel. Later, under questioning by counsel, she stated that she did have difficulty gripping things, including a coffee mug she had dropped two days prior to the hearing. (R. 52).

She further testified that she had hypothyroidism that caused fatigue "if the pills are not working for me." (R. 45). Although somewhat unclear from the testimony, she appeared to indicate that much of her experience with hypothyroidism involved her doctor changing medications, as well as her being tired all the time. (R. 46-47). When challenged by the ALJ as to how she was able to work gainfully during the last several years, she stated that she "was just doing it because I had to. I didn't have a choice. I needed insurance for myself." (R. 47).

A vocational expert appeared at the hearing. The ALJ asked the vocational expert whether someone with a sedentary exertional level could perform the plaintiff's past work. (R. 56). The VE answered in the negative, noting that the plaintiff's past work was all at the light or medium exertional level. The ALJ then asked whether allowing a person to shift

4

positions while seated, such that they would not be off-task more than ten percent of the workday, would change the availability of available jobs. The VE believed that jobs such as clerk and assembler would still be available so long as the worker was below the ten percent off-task threshold. (R. 57). The VE further testified that the sedentary jobs available would require frequent handling and fingering, as opposed to occasional. (R. 59-60). On questioning by counsel, the VE testified that none of the jobs he cited would be available if the individual could use her hands to handle and finger only three days out of a workweek. (R. 61). This is consistent with guidance from the agency: "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." SSR 96–9P.

In a written decision, the ALJ concluded that the plaintiff had two severe impairments: rheumatoid arthritis and hypothyroidism. The ALJ also found that the plaintiff had the residual functional capacity (RFC) to perform sedentary work with the following restrictions: occasional stooping, crouching, kneeling, and climbing ramps or stairs; no climbing ladders, ropes, or scaffolds; and no exposure to dangerous moving machinery and unprotected heights. (R. 90). She retained the ability to handle and finger frequently and must be allowed to shift positions in her chair while not being off-task more than ten percent of a workday. (R. 90). The ALJ considered the medical record, as well as the plaintiff's testimony, and concluded that although she was significantly limited in her work abilities, she would not be precluded from performing sedentary work. In essence, the ALJ found that "Claimant's inability to work as of June 2015 may have stemmed, in part, from performing a job that was too strenuous given her symptoms." (R. 92). The ALJ found that given the plaintiff's sedentary RFC (with

5

additional limitations), jobs like order clerk, telephone quotation clerk, and assembler remained available to her. (R. 96). From this, it followed that the plaintiff was not disabled.

## ANALYSIS

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported [her] decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's ("SSA") rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the

6

rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### 2. RFC

The plaintiff first argues that the ALJ did not properly evaluate the plaintiff's residual functional capacity. In particular, the ALJ concluded that the plaintiff would be able to "frequently" handle and finger, which means up to two-thirds of a workday. SSR 83-10. The plaintiff notes that this conclusion was crucial because the jobs identified by the vocational expert would not be available to anyone with only occasional (or less) handling and fingering abilities. (R. 56-59). Despite this crucial determination, the ALJ provided no explanation as to why the plaintiff would be able to frequently use her hands; instead, the record demonstrates (she argues) that she had substantial hand and wrist pain, stiffness, problems typing, and difficulty holding onto things such as the coffee mug she had dropped just days prior to the hearing.

The plaintiff points out that the medical record indicates substantial stiffness in the plaintiff's wrists, which had become fused due to early and extensive use of prednisone in her home country of Bosnia. This is not debatable, as practically every medical exam makes note of her stiff, fused wrists. While fused wrists would not automatically preclude the ability to use one's hands or fingers, it is certainly conceivable that the lack of wrist mobility could have an adverse impact on a person's ability to use her hands *frequently*. The ALJ did not provide an analysis of this issue.

The more salient question is whether the ALJ disregarded evidence that the plaintiff's RA caused substantial stiffness or pain in the plaintiff's fingers and hands such that she would

7

be unable to rely on her handling and fingering skills for up to two-thirds of a workday, five days per week. It is true that many medical exams revealed that her grip strength was normal (R. 295, 309, 315, 487), and, as the ALJ noted, she testified that she was able to drive a car a few times per week. (R. 53). Other indications in the record are suggestive of transient pain in her thumb that had improved, as well as a history of lesions and tender nodules on her hands (R. 306), which came and went (R. 309, 321), as well as occasional black spots on her fingers that resolved themselves (R. 312). These minor issues would not preclude use of the hands. Moreover, her medical exams with Sydney Brandwein, M.D., her rheumatologist, often do not indicate any problems with her hands or fingers suggestive of any limitations (though her wrist fusions are routinely noted). Instead, many of the records reflect the fact that her RA medication, Enbrel, was well-tolerated and, since she switched back to it in 2012, she has enjoyed "marked improvement in her joint symptoms" and "[h]er arthralgias were now well-controlled with no arthralgias, joint swelling or morning stiffness." (R. 318). In 2012 she had presented with nodules on her hands, with occasional recurrence, "which then resolved." (R. 318, 312, 306). As for the joints in her hands, the exams regularly noted that there was "no synovitis [inflammation] in the MCP and PIP joints [of the fingers]." (R. 321, 315, 309, 295, 487). (There is no indication, however, that any of her regular rheumatology exams occurred during one of her flare-ups, and so the evidentiary weight of these snapshots of her symptoms is limited).

However, other records reflect significant problems with her hands. In one treatment note, in 2015, Dr. Brandwein notes that "[h]er symptoms predominantly involved the hands and wrist joints." (R. 285). In 2016 x-rays of her hands showed "severe loss of cartilage with narrowing of the wrist joints bilaterally unchanged from before. [T]he MCP and PIP joints

8

were unremarkable." (R. 458). The plaintiff complained of swelling in her second and third MCP joints of the fingers, which was initially controlled with Medrol but then recurred, as well as a "painful bulge on the volar aspect of the left wrist." (R. 454). The exam showed synovitis in the left second and third MCP joints, with decreased grip strength. (R. 458, 439). Dr. Brandwein noted that the hand pain appeared to be the result of a flare that began after she temporarily stopped taking Enbrel and methotrexate while she had an upper respiratory infection. The record is unclear whether her decision to temporarily go off the medication (which suppresses the immune system) was the result of medical advice; she testified at the hearing that she had once again recently skipped her Enbrel shot because she had a sinus and ear infection. (R. 39). In any event, the x-ray and increased pain and inflammation in her hand were consistent with her hearing testimony that she had pain "everywhere, especially my hands; my hands are the worst, my wrist and my knuckles." (R. 29). When pressed by the ALJ, she explained that she was currently in a flare and that "my knuckles are all swollen. I can't do anything with this, especially with my left hand." (R. 43). That she had flares of some frequency was also supported by her testimony that she required more than a month of FMLA (unpaid) leave every year due to flare-ups, testimony she bolstered by showing that she knew she could take up to twelve weeks of leave each year. *See* 29 U.S.C. § 2612(a)(1). Notably, this was a seemingly unsophisticated claimant who did not know how much a bottle of water weighed, nor what distance she could walk in feet or yards—she said she was "bad with numbers"—yet she knew the FMLA provided 12 weeks of unpaid leave. (R. 39-41).

  In sum, there is enough evidence of hand pain and swelling in the record to at least require a discussion as to why the ALJ believed the plaintiff had the capacity for frequently

9

using her hands on a full-time basis. Without that analysis, the RFC determination lacks the requisite logical bridge.

### 3. *Treating Source Opinion*

The limitations in the plaintiff's use of her hands are also supported by the opinion filed by Dr. Brandwein, her treating rheumatologist, which indicates that although the plaintiff "might be able to do a sedentary job," she is "limited for the use of her hands as she has frequent flares of inflammation in her hand joints. In addition, her wrist joints are fused with little or no movement." (R. 520). He noted that she had been his patient for "many years" and that, although he was indeed "sympathetic" to her, he stood behind his professional opinion that her "severe flares" would cause two or more absences per month and that her hand pain would limit her ability to perform even sedentary work. (R. 523). The ALJ gave this opinion some weight but did not find it controlling. (R. 94).

Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2). If the opinion of a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record," the opinion must be given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, the ALJ may not simply reject it. SSR 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she must evaluate the opinion's weight by considering a variety of factors, including the length, nature, and extent of the claimant and the source's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the source is a specialist. *See* 20 C.F.R. § 404.1527(c). *Kaminski v. Berryhill,* 894 F.3d 870, 874, 874 n.1 (7th Cir. 2018) (for claims filed

10

before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record.").

The ALJ must always give "good reasons" for the weight given to a treating physician's opinion. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. "An ALJ can reject [a treating source's] opinion only for reasons supported by substantial evidence in the record." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)).

The ALJ did not appear to consider at least two of the factors that must be discussed when giving a treating source opinion less than controlling weight. First, the ALJ did not discuss the fact that the treating source opinion in this case was provided by a physician who had treated the plaintiff several times per year for a number of years; although the exact length of the treatment relationship is unclear, the treatment notes in the record date back to 2014, and these notes, which contain details of her prior treatment, strongly suggest a care history dating to several years earlier. Under 20 CFR § 404.1527(c)(2)(i), "[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." And whenever "the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source." *Id.*

11

Nor is it clear that the ALJ considered the fact that the treating source was a specialist in the plaintiff's illness. *See* 20 C.F.R. § 404.1527(c). The ALJ noted at one point that the plaintiff had seen a rheumatologist (R. 91) but did not provide any discussion of the fact that Dr. Brandwein was a specialist. *Catherine D. v. Berryhill*, No. 18-CV-3262, 2019 WL 1468145, at *3 (N.D. Ill. Apr. 3, 2019) ("The ALJ noted that Dr. Colbert was a rheumatologist. But the analysis stopped there. The ALJ's opinion does not reflect what consideration she gave to the fact that Dr. Colbert was a rheumatologist, especially considering that the regulations generally "'give more weight to the medical opinion of a specialist about medical issues related to [ ] her area of specialty.'")(citing 20 C.F.R. § 404.1527(c)). The deference afforded to specialists is particularly applicable in a case like this one. A chronic illness like RA presents substantial difficulty in assessing disability because it often presents as a moving target. There are periods when a claimant is relatively stable while under treatment with one or more medications. Even during these "stable" periods, however, there are flareups of varying frequency and duration that give rise to the proverbial "good days and bad days." In addition, as the ALJ noted, there are also periods in which the claimant is *not* in a stable treatment phase. For example, the medication that might once have provided relief initially can begin to lose its efficacy, and the patient is switched to one new drug and then another, usually with varying success. (E.g., R. 312). Here, Enbrel appeared to have worked initially, then not, then it worked again when retried a second time. A second kind of instability can also arise when a patient is unable to take her medication—in this case, on some occasions, due to infections or the loss of insurance. In short, given the shifting and complicated nature of symptoms caused by diseases like RA, it seems advisable to pay special attention to the views of a treating physician, particularly a rheumatologist with a lengthy and well-established relationship with

12

the claimant. The regulations recognize that treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(1). Particularly when faced with a disease characterized by the waxing and waning of flares, the discrete snapshots provided by treatment notes from occasional physician visits seem less probative of the claimant's abilities than the more comprehensive statement by the treating physician.

The ALJ did provide some reasons for not fully crediting the treating source's opinion. First, the Enbrel medication seemed generally to be helping eliminate stiffness and arthralgia. (R. 92). But, as noted above, there is no evidence that any of the plaintiff's physician visits occurred during a flare, and so it could be dangerous to read too much into a handful of relatively normal physical exams. Additionally, it is unclear what inference should be drawn when treatment notes indicate that a drug like Enbrel is producing favorable results. "[I]n the case of a progressive and degenerative illness such as rheumatoid arthritis, saying that the condition is 'well-controlled' may only mean that its progression has been slowed, not that the patient is no longer suffering from its effects." *Newton v. Colvin*, No. 3:12-CV-776 JD, 2014 WL 772659, at *10 (N.D. Ind. Feb. 25, 2014). As the plaintiff testified, and as Dr. Brandwein stated in his opinion, even while on Enbrel she experienced frequent flares. The Enbrel may have reduced their number and severity, but the evidence does not support the conclusion that she no longer experienced any joint pain or swelling; nor does it suggest that either the plaintiff or her physician were dramatically exaggerating the frequency of her flares. Success with the medication appears to be defined as a reduction in symptoms and flares rather than an outright elimination of them. "There can be a great distance between a patient who

13

responds to treatment and one who is able to enter the workforce." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

The ALJ also relied on the fact that there were not many reported flares in the medical record, concluding that Dr. Brandwein's "treatment notes do not support the frequency or severity of flares described in this opinion." (R. 94). The premise of this observation is that if a patient experiences a flare-up, it would necessarily generate some kind of paperwork—a "treatment note." If true, the absence of any records could indeed suggest that the reported flares were exaggerated. However, the plaintiff testified that although at one point she had reported all of her flares to the doctor, she had stopped doing so because she was able to treat herself with prednisone—her doctor had given her a "big bottle" so that she needn't call him for every flare. (R. 33). In addition, though it is true that she said she *had* called the doctor during flares until roughly 2016 (although she seemed hazy on the date), it is not clear that merely calling the doctor for advice would have generated "treatment notes" that would have found their way into the medical record. In short, the absence of medical records evidencing flares appears to be of limited probative value, particularly in light of the treating physician's statement to the contrary, as well as the plaintiff's fairly specific testimony about using significant amounts of FMLA leave when she had flares. In short, although it is conceivable that Dr. Brandwein's opinion could be found not to be controlling, the reasons cited by the ALJ do not suffice. "These reasons for discounting a treating source would be viable if the treating source had played only a small role in the claimant's treatment, that is, if a treating source's opinion went against the grain of a multitude of other clinical findings and records. But Dr. Gowing was hardly a peripheral figure in the Plaintiff's course of treatment—he was

14

the central figure, the rheumatologist who saw her every three months over several years." *Cyracus v. Colvin*, No. 15-C-172, 2016 WL 865289, at *3 (E.D. Wis. Mar. 2, 2016).

Finally, I note that Dr. Brandwein's opinion was not a "check the box" form, nor was it a blanket, conclusory statement that the plaintiff was disabled. In fact, Dr. Brandwein nuanced his opinion by stating that the plaintiff might well be able to perform sedentary work, but that the difficulties with the use of her hands could be very limiting. (R. 520). This lends extra weight to the treating source's opinion. In sum, the Commissioner should give further consideration to the opinion of the treating rheumatologist or explain in greater detail why the treating source's opinion is not to be given controlling weight.

## CONCLUSION

The case is **remanded** to the Commissioner for further consideration of the plaintiff's ability to use her hands, as well as consideration of the opinion of the treating source physician. The clerk will enter judgment accordingly.

**SO ORDERED** this 22nd day of April, 2020.

STEPHEN C. DRIES
United States Magistrate Judge